UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR-06-59-B-W |
| | ) | |
| SHAUN G. LEMOINE | ) | |

AMENDED[1] DETENTION ORDER

Concluding that the Government sustained its burden to demonstrate by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community, this Court grants the Government's motion for Shaun Lemoine's pre-trial detention.

**I. Background**

On June 6, 2006, a Hancock County Grand Jury indicted Shaun G. Lemoine for burglary, a Class B felony, *Govt.* Ex. 11, and on August 16, 2006, the United States filed a criminal complaint against Mr. Lemoine, alleging two counts of the knowing receipt of firearms while under felony indictment and two counts of false statements in acquisition of firearms. *Comp.* (Docket # 1). Following his arrest on August 18, 2006, Mr. Lemoine made his initial appearance on the same day and pursuant to a Government motion for temporary detention, Mr. Lemoine was ordered temporarily detained under 18 U.S.C. § 3142(f)(2). A detention hearing was held pursuant to 18 U.S.C. § 3142(f) on August 23, 2006.

**II. Legal Standards**

---

[1] This Amended Detention Order merely corrects a typographical error contained on the last line of page 6 of the Order of Detention dated August 25, 2006. The Order of Detention dated August 25, 2006 currently reads "This is not the last allegation of a run with Mr. Amburg." It should read: "This is not the last allegation of a run-in with Mr. Amburg."

Section 3142 sets forth the standards to determine whether a person charged with a federal crime may be detained pending trial. *United States v. Dillard*, 214 F.3d 88, 90-91 (2d Cir. 2000). Under the Bail Reform Act, paragraph 3142(a)(4) specifies that, for defendants arrested on criminal charges, pretrial detention is available only pursuant to subsection (e). Subsection (e) states that a person may be detained if the judicial officer finds after a hearing under subsection (f), that no condition or combination of conditions will reasonably assure the "safety of . . . the community."[2] 18 U.S.C. § 3142(e). Subsection (f) allows a detention hearing before a judicial officer if the defendant has been charged with an offense that "involves the use or possession of a firearm . . . ."[3] *Id.* § 3142(f). The Government bears the burden of supporting its motion "by clear and convincing evidence," *id.* § 3142(f)(2), and the statute sets forth a series of factors the court must consider in making its determination, including whether the offense involves a firearm. *Id.* § 3142(g).

## III. Detention Hearing

### A. A Division of Opinion

Mr. Lemoine, 26 years old, is a lifelong resident of Swans Island, a beautiful and self-contained coastal island near Mount Desert Island. Swans Island, which consists of

---

[2] The statute also provides that detention may be ordered if no condition or combination of conditions will reasonably assure the defendant's appearance as required; however, the Government did not claim this provision applied to Mr. Lemoine. 18 U.S.C. § 3142(e).

[3] Effective July 27, 2006, Congress amended 18 U.S.C. § 3142 to allow pretrial detention for offenses involving firearms and to require consideration of this offense as a factor in determining whether to grant pretrial detention. Adam Walsh Child Protection and Safety Act, Pub. L. No. 109-248, 120 Stat. 617, at § 216 (codified at 18 U.S.C. § 3142(f)(E), (g)) (effective July 27, 2006). This amendment statutorily resolves whether the Government may move for pretrial detention for an offense involving possession of a firearm. Previously, the statutory standard turned on whether a charge of illegal possession of a firearm was a crime of violence within the meaning of 18 U.S.C. § 3142(f)(1)(A), an issue on which courts were divided. *Compare United States v. Dillard*, 214 F.3d 88 (2d Cir. 2000); *United States v. Escobar Gonzalez*, No. 05-063, 2005 WL 459643 (D.P.R. Feb. 25, 2005); *United States v. Colon Osorio*, 188 F. Supp. 2d 153 (D.P.R. 2002); *with United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999); *United States v. Say*, 233 F. Supp. 2d 221 (D. Mass. 2002); *United States v. Powell*, 813 F. Supp. 903 (D. Mass 1992).

2

approximately twenty square miles, is accessible only by boat; it has about 350 full-time residents and swells to about 1,000 residents in the summer. News of the detention hearing apparently spread throughout the Island and a small crowd of residents appeared at the hearing. Both the Government and the Defendant called a number of witnesses.

There is a distinct division of opinion about Mr. Lemoine's character and whether he poses a threat to others.[4] Some witnesses, including Gilbert Lemoine, the Defendant's father, Robert Harris, a local volunteer librarian, Gwen May, the Town Clerk and Treasurer, and others describe Mr. Lemoine as essentially kindhearted and non-violent. While acknowledging that Mr. Lemoine has a reputation in some circles as a "hell raiser," that he has had "a dark cloud hanging over him," and that he has made some "bad choices," these witnesses said that there are those who "like to believe the worst" about anyone, especially when that person is Mr. Lemoine. In the words of Robert Harris, some have "demonized" Mr. Lemoine and even joked that "if it is a bad day, it must be Shaun Lemoine's fault." Mr. Harris and Ms. May explained that as the Island has no newspaper, much news is by word of mouth; in other words, it is gossip, and as gossip, it tends to exaggeration.

Other witnesses, however, believe his reputation for violence and mischief is well deserved. Two of the three-member Board of Selectmen, Dexter Lee and Carroll Staples, voiced concerns on behalf of as many as fifteen to twenty Swans Island residents that if Mr. Lemoine were released, they would be afraid of retribution. Through federal and

---

[4] Some testimony addressed what appeared to be a longstanding and simmering suspicion among some Swans Island lobstermen about the Defendant. Lobstermen tend to be territorial and incursions into what is known to be their space are not taken kindly. These frictions are occasionally exacerbated when gear is lost or trap lines go missing, especially after a deep fog. It is clear that some lobstermen retain an abiding conviction that Shaun Lemoine has had a hand in their missing equipment. The evidence of his direct involvement, however, is not sufficiently convincing to add to the list of accusations against Mr. Lemoine for purposes of his detention.

local law enforcement officers, including David Lemoine, the Defendant's second cousin, the Government introduced evidence of his extensive and recent criminal history, including acts of retaliation. The Government also produced evidence of his possession of an array of firearms, four of which he had purchased since the June 6, 2006 state indictment and since his June 23, 2006 release on bail with conditions against any firearms possession.

### B. The Statutory Criteria

To resolve the community division of opinion, this Court has applied the statutory criteria in 18 U.S.C. § 3142(g):

**(1) The nature and circumstances of the offense, including whether the offense involved firearms - 18 U.S.C. § 3142(g)(1)**

The criminal complaint charges Mr. Lemoine with four firearms offenses. As directed by Congress, this is a factor against release. The circumstances of the offense are also troubling. Mr. Lemoine was indicted on June 6, 2006. While still under indictment, on August 2, 2006, he is alleged to have purchased two firearms from a firearms dealer in Southwest Harbor, a Smith & Wesson 9 mm. cal. pistol and a Remington Model 742 .30-06 cal. rifle and, on August 9, 2006, he is alleged to have purchased two additional firearms from the same dealer, two Jimenez Arms Model JA9, 9 mm. cal. pistols. Although there is some evidence that Mr. Lemoine is a gun collector, there was no evidence these pistols were collectors' items. Nor is there any evidence that these weapons are suitable for hunting or target practice. In particular, the JA9s are small, easily concealed, and serious.[5] The type of firearms is a factor against release.

---

[5] Mr. Lemoine presented evidence that he has had a concealed weapons permit. But, the Government presented further evidence that Chief of Police Jerry Michaud revoked his permit by certified mail on June 28, 2006. *Govt.* Ex. 9.

4

In addition, federal ATF Agent McSweyn testified about a search of Mr. Lemoine's residence and truck. His residence contained a bow and arrows, knives, a machete, ammunition, and a .45 caliber pistol.[6] More significant was the search of his motor vehicle. Parked alongside the Lemoine pier was Mr. Lemoine's unlocked Dodge pick-up truck. When Agent McSweyn looked inside, he saw a pistol in plain view on the front seat. Pursuant to the search warrant, the Agent searched the Lemoine pick-up and found: a JA9 pistol in the center console with a loaded magazine, but no rounds in the chamber; a Ruger Model P 95 under the front seat, loaded with a round in the chamber; another JA9 pistol unloaded in the passenger door compartment; and, a Webber .44 magnum rifle in the rear passenger seat. The presence in his pick-up of a small arsenal of weapons, two of which were loaded, one with a round in the chamber is another factor against release.

**(2)  The weight of the evidence against the Defendant - 18 U.S.C. § 1342(g)(2)**

Agent McSweyn attached an affidavit to the criminal complaint. The affidavit revealed that Agent McSweyn's investigation was precipitated by information from Swans Island Police Chief Michaud to the effect that Mr. Lemoine, though under state indictment, had purchased a firearm from a federally-licensed firearms dealer in Southwest Harbor. The affidavit goes on to confirm discussions with the firearms dealer that Mr. Lemoine had purchased firearms on two occasions in August 2006 and had answered, "No," to the question on ATF Form 4473 as to whether he was under indictment. Agent McSweyn's further investigation revealed that Mr. Lemoine had traded a Smith & Wesson pistol for archery equipment on August 3, 2006 and as noted,

---

[6] The search also revealed a Ruger .22 pistol; Cassandra Lemoine, Mr. Lemoine's wife, testified she purchased the .22 and the weapon was hers.

5

Agent McSweyn's testimony confirmed the presence of a number of firearms in Mr. Lemoine's pick-up.

During the hearing, Mr. Lemoine introduced evidence that he is not a proficient reader and the town volunteer librarian testified that he tended to read "for gist." Mr. Lemoine argued that the evidence would establish that he had not read Form 4473 and instead relied on his prior knowledge of the form from previous purchases. Be this as it may, there was no real response to the allegations in the Complaint that Mr. Lemoine actually possessed one or more firearms. The weight of the evidence, particularly on the possession charges, is a factor against release.

**(3)    The history and characteristics of the Defendant - 18 U.S.C. § 3142(g)(3)(A)**

The statute directs the court to consider a number of factors relating to the Defendant's history and characteristics, ranging from his criminal record to his family ties. Mr. Lemoine's criminal history included a conviction for criminal mischief on December 21, 2004. *Gov't* Ex. 1. This incident was disturbing, because it reflects a retaliatory streak in Mr. Lemoine. The police report revealed that Mr. Lemoine had slashed all four tires on an automobile owned by a Nicholas Meirer. When questioned, Mr. Lemoine had admitted to the incident, which was caught on videotape at the town pier parking lot, but explained he had slashed Mr. Meirer's tires because he thought Mr. Meirer had tried to run him off the road the day before.

On January 26, 2006, Mr. Lemoine pleaded guilty to another charge of criminal mischief. *Govt.* Ex. 2. Sergeant David Lemoine, the Defendant's second cousin, testified that the Defendant had slashed the tires of yet another individual. This time the victim

was an elderly man with some medical problems. This man had gone to Mr. Lemoine's wife for a haircut. Mr. Lemoine had taken umbrage, not wanting this gentleman to be around his wife and child and, in retaliation, he slashed the man's tires.

On the same day he pleaded guilty to this second charge of criminal mischief, Mr. Lemoine also pleaded guilty to theft. *Govt.* Ex. 3. Sergeant Lemoine explained that Mr. Lemoine and some of his friends were watching television and began to experience problems with reception. They solved the problem by proceeding over to a neighbor's house, climbing on his roof, removing his antenna, and placing it on their roof.

The state charge currently pending against Mr. Lemoine is that on March 30, 2005 he burglarized a residence owned by Joshua Amburg. *Govt.* Ex. 11. The allegation is that Mr. Lemoine together with some friends entered Mr. Amburg's residence, removed his wood stove, and took it to a friend's home. This is not the last allegation of a run-in with Mr. Amburg. On November 8, 2005, Mr. Lemoine was charged with theft by receiving stolen property. Sergeant Lemoine testified that someone had removed the tires from Mr. Amburg's vehicle, transported the tires off Swans Island, and installed them on another person's vehicle on Mount Desert Island. An eyewitness was prepared to testify that he saw the tires being ferried to Mount Desert Island on Mr. Lemoine's boat. This charge was later dismissed, when it was determined that the evidence of Mr. Lemoine's direct involvement was insufficient. Sergeant Lemoine also testified that the person, who had cooperated with the police and provided the evidence that it was Mr. Lemoine's boat that had transported the tires, later found his boat motor disabled while on the ocean, when numerous rubber lobster bands mysteriously entered his gas line.

Finally, police reports reflect that Mr. Lemoine may have been involved in the theft of a washing machine from the Borei cottage in the spring of 2005. The person who confirmed Mr. Lemoine's involvement was Christopher Lemoine, one of his friends. When the police interviewed Christopher Lemoine in the Hancock County Jail in the spring of 2006, they said that Mr. Lemoine admitted that the Defendant had revealed his involvement in the washing machine burglary. *Govt.* Ex. 4. However, at the same time, Christopher Lemoine expressed fear of the Defendant. *Id*. This fear may have been justified. A police report reflects that on December 28, 2005, Christopher Lemoine's father, Gerald Lemoine, had called the Swans Island police, complained that the Defendant had fired several shots from a motor vehicle in the direction of the Lemoine residence, and alleged that Mr. Lemoine fired the shots to warn his son against testifying against him.[7] *Govt.* Ex. 5. In conclusion, Mr. Lemoine's criminal history is another factor against release. His criminal history is recent, evidences a cavalier attitude toward compliance with basic rules of society, and demonstrates a tendency to exact retribution against those he perceives have wronged him.

There are positive aspects to Mr. Lemoine's presentation. He is a hard worker, lobster fishing nearly 475 traps, and as a result, when working, he earns a significant income. He is married and has a young child. He is deeply interwoven in the Swans Island community, where he has strong ties of family and friendship. Both his father and his father-in-law testified on his behalf and offered to monitor his activities, if released. It is also true that the sense of fear Mr. Lemoine generates in some people is not universally shared and he is perceived by many as a genuinely nice and contributing member of the Island community.

---

[7] Gerald Lemoine later declined to press any charges.

8

> **(4) Whether, at the time of the current offense or arrest, the Defendant was on probation, parole, or other release pending trial – 18 U.S.C. § 3142(g)(3)(B)**

One further statutory factor is whether the Defendant was on probation, parole, or other release pending trial when he was arrested on the pending federal charge. 18 U.S.C. § 3142(g)(3)(B). Here, on June 23, 2006, Mr. Lemoine had been bailed on the state charges and as a condition of bail, he was ordered not to "possess any dangerous weapons including but not limited to firearms." *Govt.* Ex. 12. Based on the contents of the Agent's affidavit and the results of the search of his residence and his motor vehicle, there is convincing evidence that he violated those bail conditions by possessing one or more firearms and other dangerous weapons. His apparent violation of the bail conditions is another factor against his release, since it does not bode well for his compliance with bail conditions, if he were released on the federal charges.

> **(5) The nature and seriousness of the danger to any person or the community – 18 U.S.C. § 3142(g)(4)**

Even though there is ample testimony that some Swans Island residents are afraid of Mr. Lemoine and are concerned about his release, the relationship between this case and their fear is less than clear. The moving force of the ATF investigation is the Chief of Police, Jerry Michaud, who, as Agent McSweyn's affidavit states, contacted Agent McSweyn about the potential firearms violation. There is no evidence where Chief Michaud obtained his information and whether the Defendant would likely retaliate against any specific individual as a result of the initiation of federal charges. There is some implication that witnesses critical to the pending state burglary charge might be at risk, especially since Mr. Amburg apparently lost his tires after the wood stove burglary

and since Christopher Lemoine expressed his concern. Nevertheless, neither Christopher Lemoine nor Joshua Amburg testified at the detention hearing.

The danger to the community, however, is best summed up by Mr. Lemoine himself. On August 6, 2006, Sergeant David Lemoine spoke to the Defendant while investigating some obscene and vaguely threatening language posted prominently on a storage tank located on the Defendant's pick-up truck. When he asked the Defendant about the language on the tank, Mr. Lemoine responded that he intended to live the rest of his life fishing on Swans Island and if anyone messed with him, they "would end up with a bullet or an arrow in them." *Govt.* Ex. 10. Given Mr. Lemoine's then possession of both firearms and an archery set, this Court takes him at his word and concludes he represents a threat of bodily harm to those he perceives as interfering with him.

### a. No Condition or Combination of Conditions

Mr. Lemoine presented an alternative to incarceration. Scott Alley, his father-in-law, who lives in Southwest Harbor, offered to allow the Defendant to live with him and to assure that he not return to Swans Island. Both his father and father-in-law testified that they would actively monitor his activities and make certain he did not set foot on Swans Island. Mr. Lemoine further represented that he was agreeable to electronic monitoring and to periodic telephone reporting requirements. He also noted that as a lobster fisherman with a large number of traps, he would be unable to tend his traps during any period of incarceration and his absence would have an adverse impact on his financial well-being and on his family.

This Court appreciates the willingness of the Defendant's older relations to oversee his activities and to make certain that he complies with conditions of release.

However, one purpose of his release would be to allow the Defendant to continue to fish for lobster, an activity that would bring him close to Swans Island, close to some who have expressed concern about his release, and close to the temptation for mischief. Further, Mr. Lemoine, the father, and Mr. Scott Alley, his father-in-law, have their own jobs.  Mr. Lemoine is himself a lobster fisherman and Mr. Alley is the road foreman for the Town of Southwest Harbor.  It is unrealistic to expect these gentlemen to assure the Defendant's compliance with this Court's order, especially where the Defendant himself has manifestly failed to comply with a similar court order in the past.

### IV.  Conclusion

This Court concludes that the Government has met its high burden in this case and has demonstrated by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of other persons and the community.  The Defendant is ORDERED detained pending further order of this Court.

The Defendant is committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The Defendant shall be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility shall deliver the Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

SO ORDERED.

                                    <u>John A. Woodcock, Jr.</u>
                                    JOHN A. WOODCOCK, JR.
                                    UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2006